Filed 12/15/25  P. v. Ruiz CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> RAFAEL RUIZ, <br><br>     Defendant and Appellant. | B340216 <br><br> (Los Angeles County <br> Super. Ct. No. BA516537) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ray G. Jurado, Judge.  Conditionally reversed and remanded with directions.

Monique Hemli-Munoz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Eric J. Kohm and Lauren Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

Rafael Ruiz appeals from the judgment entered after he pleaded no contest to one count of assault with a deadly weapon. Ruiz contends the trial court abused its discretion in denying his request for pretrial mental health diversion under Penal Code section 1001.36[1] because substantial evidence does not support the court's finding he was likely to commit a super strike if released. We agree and conditionally reverse the judgment. We remand for the court to consider whether mental health diversion is appropriate in this case in light of the goals of the mental health diversion statute set forth in sections 1001.35 and 1001.36.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Assault*

On the morning of July 14, 2023 Alejandra Cortez was sitting on a bench waiting for the bus when Ruiz crossed the street and came up behind her.[2] Cortez recognized Ruiz from seeing him around the neighborhood. Cortez was watching something on her phone when she "felt like a blow" causing pain to the area between her neck and shoulder. She stood up, turned around, and saw Ruiz running off. No one else was around. Cortez initially did not see an injury on her body. But when she tried to rub her shoulder area, her "hand got stuck with what

---

[1] Further statutory references are to the Penal Code.

[2] We include Cortez's testimony from the preliminary hearing because the trial court considered the testimony in denying Ruiz's motion for mental health diversion.

2

[Ruiz] had injured [her] with," which she described as a metal knife (the blade) without the handle. As soon as she felt the knife, she took it out and "tossed it" near the bus stop. Cortez described the knife as having a three-to-four-inch metal blade.

Cortez observed she had sustained a "cut" on the area of her neck and shoulder area, and "something was hanging from there. And there was some blood coming out, not much." Cortez indicated the cut was one to two inches long. Cortez received medical attention, including putting glue on the area, but she did not receive stitches. She was also given medication for the pain and had one follow-up visit with a doctor.

On April 4, 2024 the People filed an information charging Ruiz with a single count of assault with a deadly weapon (§ 245, subd. (a)(1).)

B. *Ruiz's Motion for Mental Health Diversion and Denial of the Motion*

On May 2, 2024 Ruiz filed a motion for mental health diversion pursuant to section 1001.36. In his motion Ruiz argued that he had no prior criminal record and had been consistently receiving drug and psychiatric treatment in an inpatient dual diagnosis treatment program (at the Community Based Social Services Program with monthly psychiatric visits to the Brownstone Wellness Center), including individual and group drug treatment sessions, 12-step meetings, and psychiatric medication management.

Ruiz submitted a report from Dr. Daniel King, who conducted an evaluation of Ruiz; interviewed Ruiz's mother and the program director of the drug treatment program; and reviewed the police reports and body camera footage from the incident, a 2023 psychiatric report, and Ruiz's

3

medical records.  Records from Brownstone reflected that in 2023 Ruiz was diagnosed with schizophrenia with a prior history of bipolar disorder, and he was prescribed an antipsychotic medication.

At the time Dr. King spoke with him, Ruiz was 30 years old and had been using methamphetamine since he was 14 years old.  Ruiz reported he had been diagnosed with schizophrenia in 2021.  At the time of the offense he was "on a binge" and was using methamphetamine daily.  He was "not in a good place" and "didn't know what [he] was doing." He had a knife because he feared "dangerous people out there," and he had a delusion he needed to become a gangster and steal Cortez's purse.  He said he wanted to "scare [Cortez] to give [him] the purse," but when he went to scare her with a "fake strike," he accidentally hit her.  Ruiz had previous physical altercations with family and friends who were also using methamphetamine.  But according to Ruiz, he had never used a weapon against someone, never seriously injured someone, and never assaulted someone without provocation.  He added, "I don't like starting fights."

As of May 2024, Ruiz had been in the inpatient treatment program for nine months.  The program director reported that Ruiz was compliant with program rules, interacted normally with others, and "was motivated to remain abstinent from drugs."  Ruiz reported that he had previously attended the same drug rehabilitation program a year earlier but dropped out after two or three months when "charges" against him were dropped.  Ruiz stated he felt more motivated to participate in the program this time and

4

was maintaining his abstinence because it was a "good place to be" and "I can feel the damage that meth is doing to me."

Dr. King provided opinions with respect to four criteria for mental health diversion. First, Ruiz suffered from a "stimulant use disorder, amphetamine-type substance," which was a mental disorder identified in the Diagnostic and Statistical Manual of Mental Disorders—Fifth Edition (DSM-5). Ruiz also met the criteria for schizophrenia and/or major depressive order. Second, Ruiz's mental health condition played a significant role in his commission of the charged offense given Ruiz's account of the crime, which was corroborated by police body camera footage and the recovery of methamphetamine in Ruiz's possession at the time of his arrest.

Third, Dr. King opined that Ruiz would respond to mental health treatment, noting that Ruiz had maintained his abstinence since attending the residential drug treatment program for the prior nine months and had been taking his psychiatric medication. Further, Ruiz was motivated to maintain his sobriety and stability. Thus, "[i]f he develops a strong relapse prevention plan and has support to help him adhere to this plan after he leaves the residential program, there is a good chance he will be able to maintain abstinence with reduced supervision and structure."

Finally, with respect to the question, "Does the defendant pose an unreasonable risk of danger to public safety," Dr. King opined: "If he remains abstinent, no." Dr. King explained, "Based on all of the information I have reviewed I do not have any reason to believe he would

5

engage in unprovoked violence when not under the influence of drugs. I am unaware of any prior conviction for a violent offense. His mother denied observing violence or threats of violence. The program director did not report that he had been violent in the program. However, if he relapses and uses methamphetamine his risk of harming others would significantly increase. There is an increased risk of violence for any person when under the influence of stimulants or alcohol." Dr. King recommended Ruiz complete the one-year inpatient drug treatment program, continue to attend weekly individual and group psychotherapy, and upon his discharge live in a place with the lowest risk of relapse triggers, potentially with his mother.

On May 17, 2024 the trial court held a hearing on Ruiz's motion for mental health diversion. The People did not file a written opposition but opposed the motion at the hearing, arguing Ruiz posed an unreasonable risk of danger and was not suitable for mental health diversion under section 1001.36. The prosecutor argued Ruiz came up to an "innocent lady" (Cortez) while she was sitting on the bench and stabbed her "very close to her neck," causing a two-inch stab wound. Further, Dr. King had performed a "minimal interview" of Ruiz, and despite Ruiz's deep psychological problems, Dr. King based his opinion on Ruiz's treatment for narcotics.

The trial court expressed its concerns with mental health diversion, noting that according to Dr. King, if Ruiz relapsed in his drug use, he would have an increased risk of harming others. Further, the court continued, Ruiz had stated to Dr. King "that about 90 percent of the physical

6

altercations he's been involved in have involved use of methamphetamine." The court also raised a concern whether Ruiz would respond to treatment given that a year earlier he had dropped out of the same drug treatment program. In addition, the court noted the report stated Ruiz's insight into his own mental health problems was "questionable."

Ruiz's attorney responded that the standard for dangerousness was whether the defendant was likely to commit a super strike while being treated in the community, so the law contemplates the defendant is receiving treatment. Moreover, Dr. King found Ruiz had insight into his methamphetamine use, had been taking his prescribed medication, and had been receiving treatment in the community for nine months without any problems. Ruiz also had a "full service partnership" that would provide more comprehensive support through the Department of Mental Health.[3]

After hearing argument of counsel, the trial court denied Ruiz's motion, explaining, "based on the nature of the offenses reflected in the preliminary hearing transcript, despite the fact that Mr. Ruiz has been doing well in the program, I still find, based on those facts, that he will pose an unreasonable risk of danger to public safety in that he

---

[3] Ruiz's counsel also noted that Ruiz had not been arrested before, and there was no record of any charges being brought against him. Counsel stated that it appeared Ruiz incorrectly reported that he had previously been in the drug treatment program but had dropped out, which she confirmed with Ruiz's mother.

will likely or may commit a super strike, that is, murder, if treated in the community." The court added that it would not have any objection to probation with a treatment program, but given the violence by Ruiz, "which could have resulted in death," it denied the motion.

C.     *Ruiz's No Contest Plea and Sentencing*

On July 30, 2024 Ruiz pleaded no contest to assault with a deadly weapon. The trial court sentenced Ruiz to the middle term of three years in state prison, suspended execution of the sentence, and placed Ruiz on formal probation for two years on the condition he complete a one-year dual diagnosis residential drug treatment rehabilitation program in the program he was currently enrolled in.

Ruiz timely appealed, and the trial court granted his request for a certificate of probable cause.[4]

## DISCUSSION

A.     *Governing Law and Standard of Review*

Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders. (*People v. Frahs* (2020) 9 Cal.5th 618, 626; *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147-1148 (*Whitmill*).) Under pretrial diversion, the trial court may

---

[4]     A defendant may appeal the denial of pretrial diversion following a plea of guilty or no contest by obtaining a certificate of probable cause. (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147; *People v. Padfield* (1982) 136 Cal.App.3d 218, 228.)

8

postpone prosecution at any time in the judicial process, either temporarily or permanently, to allow the defendant to undergo mental health treatment. (*Frahs*, at p. 626; *Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 133 (*Vaughn*); *Whitmill*, at p. 1148.) "The Legislature intended the mental health diversion program to apply as broadly as possible." (*Whitmill*, at p. 1149; see *Frahs*, at p. 632.)

Under section 1001.36, a defendant must be both eligible and suitable for mental health diversion. A defendant is eligible under section 1001.36, subdivision (b), if (1) the defendant has been diagnosed by a qualified mental health expert with a mental disorder as identified in the most recent edition of the DSM; and (2) the defendant's mental disorder was a significant factor in the commission of the charged offense. (See *Vaughn, supra*, 105 Cal.App.5th at p. 133; *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 891 (*Sarmiento*).)

The statute specifies four factors that must be met for a defendant to be suitable for diversion: (1) in the opinion of a qualified mental health expert the defendant's mental disorder would respond to treatment; (2) the defendant consents to diversion and agrees to waive his or her speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) if treated in the community, the defendant will not pose an "unreasonable risk of danger to public safety" as defined in section 1170.18. (§ 1001.36, subd. (c)(1)-(4); *Sarmiento, supra*, 98 Cal.App.5th at pp. 891-892.) Section 1001.36, subdivision (e), places the burden on the defendant "to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense

9

are suitable for diversion." (*See Vaughn, supra*, 105 Cal.App.5th at p. 134.)

"An unreasonable risk of danger to public safety as defined in section 1170.18, subdivision (c), means "'an unreasonable risk that the [defendant] will commit a new violent felony'" within the meaning of section 667, subdivision (e)(2)(C)(iv), which felonies are 'colloquially referred to as "super strikes."' [Citation.] 'Those super strikes are murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14.'" (*Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 679; accord, *Whitmill, supra*, 86 Cal.App.5th at p. 1149; *People v. Moine* (2021) 62 Cal.App.5th 440, 449-450 (*Moine*).) "Thus, the risk of danger is narrowly confined to the likelihood the defendant will commit a [super strike]." (*Moine*, at p. 450; accord, *Gomez*, at p. 690.)

If the defendant makes a prima facie showing that he or she meets all the statutory eligibility and suitability criteria, the court still has discretion to deny diversion. (*Vaughn, supra*, 105 Cal.App.5th at p. 134; *Sarmiento, supra*, 98 Cal.App.5th at p. 892.) However, "this "'residual'" discretion must be exercised "'consistent with the principles and purpose of the governing law.'" [Citations.] That purpose includes a strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community. Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the

10

statute and explain why diversion would not meet those goals." (*Sarmiento*, at pp. 892-893; accord, *Vaughn*, at p. 135.)

We review the trial court's decision to grant or deny a motion for mental health diversion for abuse of discretion. (*Vaughn, supra*, 105 Cal.App.5th at p. 135; *Whitmill, supra*, 86 Cal.App.5th at p. 1147.) A court abuses its discretion when it makes an arbitrary decision by applying the wrong legal standard or bases its decision on express or implied factual findings that are not supported by substantial evidence. (*Vaughn*, at p. 135; *Whitmill*, at p. 1147.)

B.    *Substantial Evidence Does Not Support the Trial Court's Finding Ruiz Was Likely To Commit a Super Strike*

Ruiz contends substantial evidence does not support the trial court's finding that he was likely to commit a super strike given that he had no prior criminal history, the instant offense was not a super strike, and Ruiz successfully completed nine months of the inpatient drug treatment and rehabilitation program. The Attorney General argues there was sufficient evidence given the nature of the offense—that Ruiz cut Cortez with a knife without provocation and could have killed her.[5] We agree with Ruiz.

It is undisputed that Ruiz had not previously been convicted of a violent offence—or any offense. The trial court relied heavily on the fact that although Dr. King opined Ruiz was not likely to commit a super strike, Dr. King acknowledged the risk that Ruiz would harm another person "would significantly increase" if he relapsed in his methamphetamine use. But

---

[5]    The Attorney General does not dispute that Ruiz meets the other section 1001.36 eligibility and suitability factors.

Dr. King observed that Ruiz had successfully completed nine months of the drug treatment program (and over a year by the time of the hearing), he was motivated to stay sober and found the program "beneficial," and he had been taking his psychiatric medication. Dr. King believed there was a "good chance" Ruiz would maintain his sobriety and stability if he had a strong relapse prevention plan and support from his family. And Ruiz had that support—his mother had a close relationship with him and visited him every day or two while he was in the program. In addition, Ruiz had in place a comprehensive support plan through the Department of Mental Health.

Moreover, even if Ruiz were to relapse and commit an act of violence, there was no evidence to support the trial court's finding that Ruiz would commit murder or another super strike offense. Notwithstanding the Attorney General's dramatic characterization of the current offense as one in which Ruiz "used a knife to slice near the throat of an unsuspecting woman," which "could have easily resulted in death," Ruiz did not inflict a significant injury. He used the knife on Cortez's shoulder, without injuring her throat. Ruiz reported that he intended to scare Cortez but accidentally cut her. With respect to the severity of the injury, Cortez did not initially know that she had been cut, and there was some blood, but "not much." The wound healed with application of glue, and Cortez had one follow-up medical visit. After Ruiz cut Cortez, he did not continue to act violently against her and instead ran away. The police later located Ruiz, and he was detained "without incident." Moreover, although Ruiz had been using methamphetamine since he was 14 and admitted he got into physical altercations with friends and family who were also using methamphetamine, the altercations

12

never rose to the level of a violent crime, nor was he ever prosecuted for any crime. Nothing in the record suggests that if Ruiz were to relapse following a one-year inpatient dual diagnosis treatment program, he would become more violent than he had been for the prior 16 years and commit murder. The fact Dr. King was not prepared to state 100 percent that Ruiz would remain sober does not alone support a finding that Ruiz would commit murder if he relapsed.

The decision in *Whitmill, supra*, 86 Cal.App.5th 1138 is directly on point. There, a veteran diagnosed with posttraumatic stress disorder with substance abuse issues was out with his girlfriend and a friend of the girlfriend; the defendant was not feeling well, and when the friend started to approach him, he fired a gunshot into the air and threatened to kill his girlfriend. (*Id*. at pp. 1142-1145.) The defendant had no history of committing violent crimes yet the trial court denied mental health diversion because, as here, the mental health expert provided a qualified opinion that the defendant would not pose an unreasonable risk of danger to public safety, but only *if* "'he abstains from substance abuse.'" (*Id*. at pp. 1145-1146.) The Court of Appeal concluded substantial evidence did not support the trial court's finding the defendant would not be able to abstain from using drugs, noting the defendant found his substance abuse treatment "'helpful,'" he was "'very willing'" to participate in further treatment, he relapsed only after learning of a family member's cancer diagnosis, and the expert believed the defendant would be able to learn to exercise control over his behavior in the future. (*Id*. at pp. 1152-1153.) As discussed, Dr. King was similarly optimistic that Ruiz would be able to

13

maintain his sobriety and stability following further treatment for his mental health disorders.

Further, providing Ruiz an opportunity to obtain treatment in a dual diagnosis treatment program is consistent with the intent of the mental health diversion statute. As the *Whitmill* court explained, providing treatment for a defendant facing mental health and substance abuse issues "goes hand in hand with the stated purpose of the mental health diversion statute as set forth in section 1001.35—to keep people with mental disorders from entering and reentering the criminal justice system while protecting public safety. . . . [Citation.] That [the expert] reported [defendant] has benefitted from treatment in the past and opined that any risk to the community by [defendant] could be mitigated by treatment suggests that [defendant] is the type of person for whom the Legislature designed the option of diversion." (*Whitmill, supra*, 86 Cal.App.5th at p. 1152; see *People v. Williams* (2021) 63 Cal.App.5th 990, 1004-1005 ["we emphasize that our trial courts must give serious consideration to this critical alternative [of treatment], for the good not just of mentally ill offenders but, ultimately, society at large"].)

The holding in *Moine, supra*, 62 Cal.App.5th 440 is also instructive. The defendant there was charged with three assaults in connection with a fistfight with a patient in the waiting room of an urgent care center and two counts of making criminal threats in connection with an incident a year later in a medical provider's waiting room in which the defendant became angry with the staff and threatened that he could get his gun and return and kill everyone there. (*Id.* at pp. 444-445.) The trial court denied the defendant's motion for mental health diversion on the basis he posed an unreasonable risk of committing a super

14

strike, but the Court of Appeal reversed, concluding the record did not meet the "high standard" of dangerousness, observing the defendant had no prior convictions for violent felonies; the current offenses were violent but not super strikes; two psychiatrists had opined the defendant posed a low risk for a future assault; and nothing else in the record supported a finding the defendant would commit a super strike. (*Id*. at pp. 444, 450-451; see *Gomez v. Superior Court, supra*, 113 Cal.App.5th at p. 690 [reversing denial of mental health diversion where defendant had no criminal history, pending charge of robbery was not a super strike, and defendant had been out in the community for approximately a year following the offense with no evidence he had committed another crime].) Ruiz, like the defendants in *Moine* and *Gomez*, had no prior convictions and no other indicia that he would prospectively commit a super strike.

*People v. Brown* (2024) 101 Cal.App.5th 113, relied on by the Attorney General, is distinguishable. In *Brown*, the defendant violently assaulted a neighbor with a metal cane, causing serious injuries, after the neighbor knocked on his door and accused him of stealing a doorstop. (*Id*. at p. 117.) A psychiatrist opined that Brown did not pose an unreasonable risk to the public if he took his psychiatric medication and avoided alcohol but conceded that if the defendant was not compliant, he could "'become quite deteriorated.'" (*Id*. at p. 118.) The Court of Appeal affirmed the trial court's denial of diversion, observing the defendant "invoked extreme physical violence against a vulnerable victim in response to a relatively minor altercation," and he continued to believe he was the victim, raising an inference he could react similarly or more severely in response to a perceived conflict in the future. (*Id*. at p. 124.) The Attorney

15

General likens Ruiz's cutting of Cortez's shoulder to the vicious beating inflicted by the defendant in *Brown*, but this characterization ignores that Ruiz cut Cortez in a less violent manner, was seeking to scare her based on his paranoid delusion, and had successfully responded to treatment of the mental disorder that resulted in his delusion.[6]

Although we agree the trial court abused its discretion in finding Ruiz ineligible for mental health diversion because he was likely to commit a super strike, the court has not yet exercised its residual discretion to decide, "'"consistent with the principles and purpose of the governing law"'" and the "strong legislative preference for treatment of mental health disorders," whether mental health diversion is appropriate here. (See *Sarmiento, supra*, 98 Cal.App.5th at p. 892.) In some cases, the appellate courts have ordered the trial court to grant the

---

[6] The Attorney General also attempts to distinguish *Whitmill* and *Moine* on the basis that in both cases there was evidence the defendants had cooperated with the police or apologized, showing they were not violent. In *Whitmill, supra*, 86 Cal.App.5th at page 1154, the Court of Appeal found the defendant's "compliant nonviolent behavior" after firing the gun (throwing the gun away instead of firing it at the friend, girlfriend, or police officer, then turning himself into the officer) mitigated any inference he was likely to commit a super strike. (*Ibid*.) And in *Moine, supra*, 62 Cal.App.5th at pages 445 to 446, the defendant immediately apologized to the staff member after making the threat, and two psychiatrists opined that given the defendant's lack of prior treatment for his mental disorder, he posed a low risk for a future assault. In this case there was also evidence after the incident that Ruiz did not pose a high risk: Ruiz voluntarily dropped the knife, ran away, and subsequently was arrested without incident.

defendant's motion for mental health diversion instead of requiring further consideration of the motion.  (See, e.g., *Whitmill, supra*, 86 Cal.App.5th at p. 1156 [reversing judgment with directions for trial court to grant motion for mental health diversion to "'avoid the unnecessary delay occasioned by yet [another] hearing'"]; *People v. Williams, supra*, 63 Cal.App.5th at p. 1005 [same].)  Because the trial court denied mental health diversion based solely on its finding that Ruiz was likely to commit a super strike, we remand for the court to exercise its residual discretion to decide whether to grant or deny Ruiz's motion.  If the court again denies the motion, "its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals."  (*Sarmiento*, at p. 893; accord, *Vaughn, supra*, 105 Cal.App.5th at p. 135.)[7]

## DISPOSITION

The judgment is conditionally reversed.  We remand for the trial court to conduct a new hearing to consider Ruiz's motion for mental health diversion limited to the question whether the court should exercise its residual discretion to deny diversion, unless there are changed circumstances that affect Ruiz's eligibility or suitability for diversion.  If the court decides to exercise its

---

[7]    Because the People did not contend in the trial court that any other section 1001.36 eligibility or suitability requirements were not met, on remand the only issue before the court will be whether to exercise its discretion to deny mental health diversion, unless there are changed circumstances affecting Ruiz's eligibility or suitability for diversion.

residual discretion, it must provide a statement of reasons reflecting its consideration of the underlying purposes of the statute and why diversion would not meet those goals, and the court shall reinstate the judgment.  If the court grants diversion, it shall refer Ruiz to a mental health diversion program.


                                        FEUER, J.

We concur:


        MARTINEZ, P. J.


        STONE, J.

18